UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| MARCELLA REBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:04-cv-368 PS |
| | ) | |
| ROAD EQUIPMENT, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on Defendant Road Equipment's Motion for Summary Judgment [Doc. 14]. Plaintiff Marcella Reberg (now Marcella Knight) brought this action alleging that Road Equipment discriminated against her in violation of the Americans With Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq.*, and that she was constructively discharged as a result of this alleged discrimination. Because we find that Reberg does not qualify as a disabled person under the ADA and because Reberg was not constructively discharged, Road Equipment's Motion is GRANTED.

**BACKGROUND**

Road Equipment is a company that sells and distributes truck parts. Road Equipment maintains a warehouse at 3450 Grant Street in Gary, Indiana which it acquired from Transcom, Inc. in 2002. Reberg originally worked in the Gary warehouse for Transcom, Inc. and was hired by Road Equipment in 2002 when Road Equipment acquired Transcom's assets. (Cmp. at ¶ 8). Initially, Reberg worked in the warehouse in shipping and receiving. According to Reberg, making deliveries was not part of her responsibilities in this position, but Road Equipment understood that driving was always part (albeit a small part) of Reberg's duties. (Williams Aff.

at ¶ 4).  Reberg does admit that while she worked for Transcom, she would fill in as-needed to make deliveries.  (Reberg Dep. at 28-29).

In the late spring or early summer of 2003, Jerry Waddell, a Road Equipment driver, left work on an indefinite medical leave.  At this time, Chris Williams, the branch manager at the warehouse, considered two employees to fill in for Waddell – Reberg and Mike Harrison.  (Williams Aff. at ¶ 5-6).  Williams decided that Harrison had more knowledge and experience in the warehouse than Reberg and, therefore, assigned Reberg to drive Waddell's routes.  (*Id*. at ¶ 7).

Reberg began driving Waddell's routes in June 2003.  (Williams Aff. at ¶ 8).  Shortly thereafter, she complained to Williams that she was having trouble staying awake while driving.  (*Id*. at ¶ 9).  The first time that Reberg complained, she did not mention that she had a disability.  (*Id*.).  Accordingly, Williams suggested that Reberg do some of the things that helped Williams when he became drowsy while driving.  (*Id*. at ¶10).  These included pulling over when tired, stopping to get a soda, turning on the air conditioner or heater, opening the windows, or turning up the radio.  (*Id*.).  Williams also told Reberg that she should see a doctor if she believed that her problem was more serious.  (*Id*. at ¶ 11).

Evidently, Reberg followed Williams's advice.  On June 20, 2003, Reberg provided a note to Road Equipment from her family physician, Dr. Carter.  (Reberg Dep. at 45).  The note stated, "Marcella has a sleep disorder and cannot drive long distances."  (*Id*. at Ex. 2).  Not understanding exactly what the note meant, Road Equipment requested that Reberg return to her doctor for clarification.  (Williams Dep. at 67).  It is unclear whether Road Equipment required Reberg to continue driving until she sought clarification from her doctor.  (*Id*.).  On July 2,

2

2003, Reberg provided Road Equipment with a second note that stated, " No driving anymore than local routes.  No driving longer than 3 hours.  No lifting more than 10 lbs." (Reberg Dep. at Ex. 3).  After receiving the second note, Road Equipment restricted Reberg's driving to local routes of approximately 5-20 minutes between deliveries, although occasionally she would drive longer. (Williams Aff. at ¶9).  In any event, Reberg testified that while she might have driven more than three hours over the course of the day, she never drove more than three hours in between any two stops.  (Reberg Dep. at 59).  In fact, she never spent two hours driving between any two stops.  (*Id*. at 62).  On July 22, 2003, Reberg gave Williams another note from Dr. Carter which read, "Return to work with no restrictions." (*Id*. at Ex. 4).  However, Road Equipment continued to assign Reberg to local routes and Reberg does not recall driving longer routes after the restrictions were lifted.  (Williams Aff. at ¶17; Reberg Dep. at 65).

      Apparently continuing to experience sleep problems Reberg visited Neurology Associates in September 2003 where she was seen by Dr. Virgil DiBiase.  (Reberg Dep at 25). On September 5, 2003, Dr. DiBiase issued a new note indicating that Reberg "is unable to drive until further notice." (Reberg Dep. at Ex. 5).  Road Equipment immediately suspended Reberg's driving and assigned her to the warehouse. (Williams Aff. at ¶ 19).

      Reberg participated in a sleep study on September 12 and 13, 2003 during which  Dr. DiBiase recorded her sleep pattern.  On September 12, 2003, Reberg slept a total of 6.9 hours which was interrupted by 60 minutes of wake during the night. (Medical Records at 7).  The following night, she slept 5.9 hours interrupted by 45 minutes of wake.  (*Id*. at 5).   Dr. DiBiase then diagnosed Reberg with sleep apnea and periodic leg movements.  (*Id*. at 8).  It does not appear from the record that Dr. DiBiase diagnosed her as narcoleptic.  We do not know what, if

anything, Dr. DiBiase told Reberg about her ability to drive, but he did not lift the driving restriction that she provided to Road Equipment.

The circumstances surrounding Reberg's resignation from Road Equipment remain somewhat unclear. Apparently, on or around September 12, 2003 (the same day as her sleep study), Reberg had a conversation with Williams wherein Williams informed Reberg that she would continue to be a full-time driver with Road Equipment. (Reberg Dep. at 35). However, this must have been a forward-looking conversation because, as mentioned, Road Equipment had immediately suspended Reberg's driving duties and reassigned her to the warehouse after receiving Dr. DiBiase's restriction. (Williams Aff. at ¶ 19). Reberg confirms that she did not drive for Road Equipment between September 5, 2003 and September 26, 2003, her last day of work at Road Equipment. (Reberg Dep. at 76). At the meeting on September 12, 2003, after being told that she was going to have to drive once the restrictions were lifted, Reberg gave Road Equipment two weeks notice. (Reberg Dep. at 36).

It is clear that Williams understood that Reberg could not drive for Road Equipment while a restriction was in place. At his deposition, Williams testified that he could not require Reberg to drive until he received a note from Dr. DiBiase clearing the driving restriction (Williams Dep. at 80). Williams also stated that he would have found room for Reberg to work in the warehouse if her driving restrictions were not lifted. (*Id*. at 81). Nevertheless, Reberg resigned her position at that time. (Reberg Dep at 105). In retrospect, however, Reberg admits that Williams did not order her to begin driving immediately at the September 12 meeting and that there was no date certain at which she would begin driving again. (*Id*. at 101). Reberg also admits that she may have resigned prematurely. (*Id*.). Following her resignation from Road

4

Equipment, Reberg brought this action alleging that Road Equipment violated the ADA and constructively discharged her by requiring her to drive in spite of her sleep disorders and doctor's restrictions.[1]

We note that Reberg has repeatedly stated that her sleep disorder only effects her driving – and then only long drives. (*Id*. at 24, 201). Indeed, to date, Reberg continues to drive up to 10 miles per day without any restriction on her drivers license. (*Id*. at 70-71). Reberg also continues to drive a motorcycle and has an endorsement for motorcycles on her Indiana driver's license (*Id*. at 93-95).

## DISCUSSION

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1004 (7th Cir. 2000); *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When examining the evidence, the court should resolve all ambiguities and draw all inferences in favor of the non-moving party. *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 497 (7th Cir. 1999); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir. 1994).

---

[1] Reberg also claims in her complaint that she had a back condition that prohibited her from lifting more than 10 pounds. (Cmp. at ¶12). However, at her deposition, Reberg admitted that her back condition was actually temporary resulting from a pulled muscle. (Reberg Dep. at 16). Her back healed and is no longer a problem. (*Id*.).

I.      **Reberg's ADA Claim**

The ADA prohibits employers from discriminating against an employee on the basis of a qualified disability.  42 U.S.C. § 12112(a).  A plaintiff may show discrimination on the basis of disability in either of two ways: by presenting evidence of disparate treatment or by showing a failure to accommodate.  *See Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1021-22 (7th Cir. 1997).  Reberg brings only a failure to accommodate claim.  (Plf. Resp. at 2).  Failure to accommodate claims stem from language in the ADA defining discrimination in part as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual."  42 U.S.C. § 12112(b)(5)(A).

To survive summary judgment on her failure to accommodate claim, Reburg must demonstrate that: 1) she was a qualified individual with a disability;  2) that the employer was aware of her disability; and 3) the employer failed to reasonably accommodate the disability.  *E.E.O.C v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005); *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001).  Road Equipment takes issue with Reberg's ability to meet all three of these prongs.

   A.     **Disability**

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12102(2)(A).  A person may also qualify as "disabled" under the ADA if an employer regards that person as having a substantially limiting mental or physical impairment.  42 U.S.C. § 12102(2)(C).  The parties do not dispute that Reberg's sleep apnea qualifies as a physical impairment.  Instead, Road Equipment argues that Reberg is not disabled within the meaning of the ADA because she

6

is not substantially limited in a major life activity.²

A major life activity is an activity "of central importance to daily life." *Toyota Motor Mfg. of Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). Examples of major life activities include: seeing, hearing, or working in a broad class of jobs. *Id*. at 197. The regulations governing the ADA issued by the EEOC define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(I). The burden rests on the plaintiff to "prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." *Toyota Motor*, 534 U.S. at 198 (internal quotations omitted).

Reberg identifies three potential major life activities in response to summary judgment: 1) driving; 2) sleeping/wakefulness; and 3) working. We take each alleged impaired activity in turn.

1. **Driving**

The regulations defining "major life activity" do not specifically include driving but use of the phrase "such as" in the regulations suggest that the list is not meant to be exhaustive. 29 C.F.R. § 1630.2(I); *Bragdon v. Abbott*, 118 S.Ct. 2196, 2205 (1998). Nonetheless, it is clear that the ability to drive is decidedly different from the examples that are described in the regulations. It is odd to suggest that driving – an activity that is regulated by the States through

---

²For purposes of our disability analysis, we consider only Reberg's various sleep disorders. Although Reberg originally pled in her complaint that she also had a lifting restriction as a result of a bad back, she admitted in her deposition that the restriction was the result of a back strain that only effected her temporarily. Indeed, Dr. Carter released the restriction less than a month after he originally ordered it. Temporary medical conditions, such as a back strain, is not a disability under the ADA. *Waggoner v. Olin Corp.*, 169 F. 3d 481, 484 (7th Cir. 1999).

the issuance of licenses – is a major life activity on par with walking, hearing, seeing, breathing, and the like.  *Chenoweth v. Hillsborough Cy.*, 250 F.3d 1328, 1329 (11th Cir. 2001).

Moreover, while the Seventh Circuit has yet to address the issue, *see Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship.*, 209 F.3d 678, 685 (7th Cir. 2000), the majority of courts who have considered the issue have held that driving is not a major life activity.  *See Felix v. N.Y. City Trans. Auth.*, 324 F.3d 102, 106 (2nd Cir. 2003); *Chenoweth v. Hillsborough Cy.*, 250 F.3d 1328, 1329 (11th Cir. 2001); *Yindee v. Commerce Clearing House, Inc.*, 2005 WL 1458210 (N.D. Ill. June 16, 2005); *Green v. Pace Suburban Bus*, 2004 WL 1574246 (N.D. Ill. July 12, 2004).

In *Green*, for example, the plaintiff was a probationary driver for Pace Suburban Bus Service ("Pace").  During his probationary period, the plaintiff was diagnosed with health issues that physically disqualified him from driving a bus under DOT regulations and Pace policy.  In particular, the plaintiff's diagnosis included a risk that he could suddenly pass out or collapse. The plaintiff, thus, identified his major life activities as "driving" and "staying awake."  In concluding that driving was not a major life activity, the Court specifically noted that "[the plaintiff] does not contend that his inability to drive a bus limited his ability to care for himself, or seek medical care, or even limited his ability to work . . . [the plaintiff] does not even contend that he was limited in his ability to drive a car under Illinois law."  *Green*, 2004 WL 1574246 at * 7.  *See also*, *Yindee*, 2005 WL 1458210 at *3 ("The sole activity [the plaintiff] identifies as being limited by her vertigo is her driving [which,] in and of itself[,] is not of central importance to daily life, on par with activities such as seeing hearing, or working in a broad class of jobs, so it is not a major life activity as that term is used in an ADA context.").

Given the language in the regulations, we agree with the courts that hold that driving is

8

not a major life activity. In any event, this case presents an easier case because all Reberg contends is that her sleep disorders prevent her from driving long distances. Reberg admits that she commuted both ways to work, that she does not experience difficulty during "short" drives, that she occasionally drives a motorcycle (and holds a drivers license with a motorcycle endorsement), and that she has no restriction on her Indiana driving privileges. Thus, Reberg admits that the only activity that she feels is limited by her sleep disorders is her ability to drive long distances. Nothing in the language of ADA or the regulations that implement it leads us to conclude that the ability to drive long distances is a matter "of central importance to daily life." Accordingly, "driving" cannot form the basis for Reberg's alleged disability.

  **2.**  <u>**Sleeping/Wakefulness**</u>

Reberg also claims that she is substantially limited in the major life activities of sleeping and staying awake. Turning first to "staying awake," Reberg has cited no case (nor are we aware of any) in which wakefulness or the ability to stay awake was deemed a major life activity. Indeed, in *Green*, after addressing driving, the Court reviewed "wakefulness" as a potential major life activity and concluded that it was not. The court principally relied on *Katekovich v. Team Rent A Car of Pittsburgh*, 36 Fed. Appx. 688 (3rd Cir. 2002), an unpublished decision out of the Third Circuit, the only authority available. The Third Circuit found that staying awake was not a major life activity unless an inability to stay awake during the day caused an impairment of some other life activity. *Id*. at 690.

The conclusion of the *Katekovich* and *Green* Courts makes sense in this case as well. Reberg does not contend that her inability to stay awake effects any life activity other than her driving. Because we have already concluded that driving is not a major life activity, the fact that

she cannot stay awake to drive long distances also fails under the ADA.

The issue of an ability to sleep (perhaps considered as the inverse of wakefulness) is a little more complex.  Here, Road Equipment concedes that sleeping is a major life activity, but (correctly) notes that Reberg has not presented any information to demonstrate how her sleep was substantially limited.  (Def. Reply at 9).

As noted above, the burden is on the plaintiff to prove that her ability to perform the proffered major life activity is substantially limited.  *Toyota Mfg.*, 534 U.S. at 198.  When analyzing whether an individual is substantially limited in a major life activity, we look to three factors: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent long term impact, or the expected permanent or long term impact resulting from the impairment.  29 C.F.R. § 1630.2(j)(2).  Thus, in order to establish that she was substantially limited in the major life activity of sleeping, Reberg is required to establish that she was unable to sleep or was significantly restricted as to the condition, manner, or duration of her ability to sleep ***as compared to the average person in the general population,*** taking into consideration the three factors and any mitigating or corrective measures.  *Id*. (emphasis added); *Pack v. K-mart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999).

Here, we have little from Reberg regarding her ability to sleep other than a diagnosis of sleep apnea and leg movements.[3]  This is not enough.  *Toyota Mfg.*, 534 U.S. at 197 ("It is

---

[3]Reberg argues that she was also diagnosed with narcolepsy.  However, the medical records that she offered into evidence demonstrate only diagnoses of sleep apnea and periodic leg movements.  Although Dr. DiBiase indicated in his notes that her history is consistent with narcolepsy, he qualified his statement indicating what her treatment would be "if" Dr. DiBiase confirmed narcolepsy.  One month after that notation, Dr. DiBiase diagnosed her as having sleep apnea and periodic leg movements.  His later diagnosis did not mention narcolepsy.

insufficient for an individual attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment."). As to the impact of this diagnosis, Reberg has provided the Court with only two nights of data with which to compare her to the general population. Over these two nights, we know that Reberg slept 6.9 hours and 5.9 hours, respectively. Beyond those two nights, we do not know how many hours on average that Reberg sleeps nor do we know how frequently she awakens during the night. As other courts have noted, difficulty sleeping is extremely widespread. *Colwell v. Suffolk Co. Police Dept.*, 158 F.3d 635, 644 (2nd Cir. 1998). Reberg has made no showing that her affliction is any worse than is suffered by a large portion of the nation's adult population. Moreover, Dr. DiBiase's notes indicate that Reberg should have experienced marked improvement with treatment, but we cannot judge whether Reberg's condition has improved because she never followed-up with Dr. DiBiase.

Reberg simply has not provided the Court with the evidence necessary to sustain her burden of proving that her sleep apnea and/or period leg movements substantially limited her ability to sleep. Accordingly, she has failed to raise any question of fact as to whether her ability to sleep is substantially limited by her sleep apnea and periodic leg movements.

### 3. Working

Finally, Reberg posits that she is substantially limited in the major life activity of working. The Seventh Circuit has clearly held that working constitutes a major life activity. *Peters v. City of Mauston*, 311 F.3d 835, 843 (7th Cir. 2002) ("To be sure, working constitutes a major life activity under the ADA."). Although the Supreme Court later expressed some doubt about working as a major life activity, *see Toyota Mfg.*, 534 U.S. at 200 ("Because of the

conceptual difficulties inherent in the argument that working could be a major life activity, we have been hesitant to hold as much, and we need not decide this difficult question today."), the *Peters* decision has not been overruled and, therefore, remains binding.

Even so, Reberg must still demonstrate that her impairments substantially limit her ability to work. It is not enough for Reberg to demonstrate that her inability to drive long distances prevent her from working in her specific job as a driver at Road Equipment. *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523 (1999) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.") (internal quotations omitted). Instead, Reberg must demonstrate that she is unable to work in a "broad range of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 926 (7th Cir. 2001).

The EEOC regulations identify a number of factors that we must consider when determining whether an individual is substantially limited in the major life activity of working. These include "the geographical area to which the individual has reasonable access, and 'the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified.'" *Sutton*, 527 U.S. at 491-92 (quoting 29 C.F.R. §§ 1630.2(j)(3)(ii)(A), (B)). Thus, if a particular job utilizing an individual's skills is available or if a host of different types of jobs are available, that individual is not precluded from a broad range of jobs. *Id*. at 492. Ultimately, Reberg has the burden of presenting evidence to identify how her impairment limited a broad range of jobs. *Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship.*, 209 F.3d 678, 685 (7th Cir 2000).

In this case, Reberg has not met her burden. Nowhere in her response has Reberg

identified a particular class of jobs that she is unable to maintain nor does she explain how her sleep disorders substantially limit her ability to work.  Instead, Reberg emphasizes that she has a ninth grade education, that she has performed "menial" labor all her life, and that she is no longer able to drive.

As discussed below, Reberg testified that she has held a variety of different jobs over the years.  Her response does nothing to clarify how her sleep disorder somehow now disqualifies her from these other positions.  Reberg's argument, therefore, seems to have less to do with an inability to perform jobs themselves, but rather an inability to drive herself to her job.  Thus, Reberg argues, since she cannot drive to work, she cannot work.  This argument simply lacks merit.  Even if we assume for arguments sake that Reberg is unable to drive to work, there are a myriad of other ways to commute to a job.  Millions of people are driven to work each day.  Others use public transportation, bikes, walking, or car pools.  Difficulty driving to work simply does not result in a total inability to work in a broad range of jobs.  *See Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship.*, 209 F.3d 678, (7th Cir 2000) ("Getting to and from work assignments is not a major life activity.  Rather, this task is either a subspecies of the activity of 'working' or of 'driving.'").

Moreover, the record is replete with evidence that Reberg is, in fact, able to work in a variety of positions despite her disability.  Reberg stated that she has experienced problems sleeping her whole life.  (Reberg Dep. at 12).  Yet within her lifetime, Reberg worked several years for Road Equipment and its predecessor, she worked for six years as a housekeeper at a motel, she worked for a year as a bartender, and worked at least five years in other food service jobs.  (*Id*. at 8-10).  Indeed, the parties agree that driving, not other forms of working, was the

13

reason that Reberg left Road Equipment. (*Id*. at 36, Williams Dep. at 65-66). Moreover, Reberg's current state of unemployment cannot be attributed to an inability to find a job because Reberg admits that she hasn't made any effort to find a job since she was married in 2004. (*Id*. at 82). Simply, Reberg has not submitted any evidence to this Court to support her contention that she is substantially limited in her ability to work.

### B. "Regarded As"

Finally, Reberg argues that she is disabled because Road Equipment regarded her as disabled. To survive summary judgment on a "regarded as" claim, Reberg must demonstrate that Road Equipment believed, rightly or wrongly, that she had an impairment that substantially limited on or more of her major life activities. Here, the record merely establishes that Road Equipment knew that Reberg was receiving medical attention for some sort of sleep disorder and that the disorder (at least temporarily) effected her ability to drive. The record also establishes that Road Equipment continued to pursue Reberg as a potential driver. Although they heeded her doctor's restrictions, it is clear that if those restrictions were lifted, Reberg would be returned to the driver position. If not, she would be placed in the warehouse. Having already failed to identify a major life activity in which she was substantially limited, and having an employer who is attempting to find a way to work through her impairment, Reberg cannot demonstrate that Road Equipment regarded her as being substantially limited in a major life activity.

### C. Reasonable Accommodation

Because Reberg has failed to demonstrate that she is a qualified individual with a disability under the ADA, Reberg's ADA claim is dead in the water. However, even if Reberg were able to demonstrate that she was disabled for purposes of the ADA, her claim would fail

because Road Equipment reasonably accommodated her disability given the information that they had at the time.

The ADA requires that the employer and employee work together to determine a reasonable accommodation. *E.E.O.C.*, 417 F.3d at 797. The Seventh Circuit has made clear that "[a]n employee's request for reasonable accommodation requires a great deal of communication between the employee and employer." *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996). "[T]he employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. § 1630.9. The burden is on the employee to prove that the employer did not provide a reasonable accommodation. *E.E.O.C.,* 417 F.3d at 797. If an employee meets this burden, then an employer will only be liable if "it bears the responsibility for the breakdown of the interactive process." *Id.*

In this case, Road Equipment diligently attempted to follow doctor's restrictions and work with Reberg to determine the scope of her impairment and how it would effect her employment at Road Equipment. Upon receiving the first restriction from Reberg's doctor, Williams sought clarification to ensure that he was accurately following the restriction. Williams received clarification that Reberg was to drive local routes and not to drive more than three hours. Williams then gave Reberg routes that did not require her to drive more than three hours at any one time.[4] After that restriction was lifted, Road Equipment actually continued to

---

[4]After the fact, in her response to summary judgment, Reberg disputes Road Equipment's interpretation of Dr. Carter's restriction. According to Reberg, the restriction meant that she was not to drive more than three hours in one day. However, Reberg neither complained of the

15

limit Reberg to local routes. In September, after receiving the complete restriction, Road Equipment moved Reberg back into the warehouse. Finally, in response to Road Equipment's plans to eventually make Reberg a full-time driver if her sleep impairments permitted, Reberg quit.

At no time did Road Equipment force Reberg to drive in violation of her doctor's restriction. Indeed, Road Equipment seems to have done little to compel Reberg to quit other than to continue their conversation about whether or not Reberg would be able to drive in the future. Reberg cites no case, nor are we aware of any, that precludes an employer from proactively investigating whether an employee can return to her ordinary duties at the conclusion of a medical restriction.

At the end of the day, Road Equipment did its level best to follow Reberg's doctor's restrictions and to attempt to work with her to accommodate her restrictions. Reberg preemptively quit when she determined that she might be required to drive again – even though she had not yet been required to drive. There is simply no failure to accommodate to be found in the record before us.

**II.      Constructive Discharge**

Reberg also claims that she was constructively discharged. This claim is wholly without

---

treatment nor sought further clarification from her doctor. It would be patently unreasonable to say that Road Equipment ignored or failed to respond to a difference of opinion that Reberg never even expressed to Road Equipment. Had Reberg had a problem with Road Equipment's interpretation, she should have approached Williams and indicated that she did not believe that Road Equipment was properly following the restriction. This would have allowed Road Equipment to get further clarification. Reberg did not allow Road Equipment this opportunity and cannot now benefit from her silence.

16

merit. We note at the outset that the Seventh Circuit has not yet decided whether a constructive discharge claim is cognizable under the ADA. *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 440 (7th Cir. 2000) (hereinafter "EEOC II"). However, Road Equipment does not contend that there is no such legal claim. Moreover, because a number of district courts in this circuit have held that constructive discharge claims can be made under the ADA, *see, e.g., Bond v. Sheahan*, 152 F. Supp.2d 1055, 1071 (N.D. Ill. 2001), we will, for the sake of argument, assume that there is no pure legal bar to Reberg's claim. *Arnold v. Janssen Pharmaceutica, Inc.*, 2005 WL 1189596 at * 11 n.15 (N.D. Ill. May 16, 2005) (refusing to consider legal propriety of ADA constructive discharge claim because it was not raised in summary judgment).

A constructive discharge occurs when "the employer made the working conditions so intolerable as to force a reasonable person to leave." *E.E.O.C. II*, 233 F.3d at 440. Unless conditions are beyond "ordinary" discrimination, the employee is expected to remain on the job while seeking redress. *Id*. As the Supreme Court has stated, a constructive discharge occurs when there are "unendurable working conditions." *Pennsylvania State Police v. Suders*, 124 S.Ct. 2342, 2351 (2004). Moreover, it is not enough to show mere constructive discharge; the employee must also show that the constructive discharge occurred **because of her disability**. *Holley v. Pritchett*, 2004 WL 2757871 at *15 (S.D. Ind. Sept. 30, 2004) (emphasis added).

Title VII cases teach that to constitute intolerable working conditions, the conditions must be extremely egregious because in the "ordinary case an employee is expected to remain at work while seeking redress." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (citations omitted). Intolerable working conditions have been found in such environments where an employee was subjected to repeated sexual remarks and physically

17

threatening conduct, *Robinson supra;* escalating sexual comments culminating in a physical assault and death threat, *Brooms v. Regal Tube Co.*, 881 F.2d 412, 423-24 (7th Cir. 1989); where a manager held a gun to the employee's temple, took a picture and then circulated the picture at a company meeting, stating that "this is what a nigger looks like with a gun to his head," *Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188, 1191, 1199 (7th Cir. 1992); and where an employee's disputed sexual relationship with her supervisor resulted in a suicide attempt, *Snider v. Consolidated Coal Co.*, 973 F.2d 555, 557, 561 (7th Cir. 1992).

In the instant case, when reviewing the evidence and the reasonable inferences that may be drawn in the light most favorable to Reberg, the Court finds that the working environment at Road Equipment was nowhere close to "unendurable." *Suders*, 124 S.Ct. at 2351. As previously stated, Road Equipment merely continued to discuss Reberg's medical condition with her and to assume that she would return to driving if her condition improved. Indeed, Reberg even admits that she resigned prematurely and that she should have waited to find out if she was going to have to drive again. (Reberg Dep. at 101). If Reberg was so upset about the prospect of returning to drive at Road Equipment that she felt the need to resign her position, that discomfort was ultimately the result of her own preferences and worries, not any unreasonable action taken by Road Equipment.

Reberg cannot point to a single "shocking" or otherwise outrageous incident that would give rise to a constructive discharge claim. Accordingly, Road Equipment's Motion with respect to Reberg's constructive discharge claim is also granted.

## CONCLUSION

While it is clear Reberg suffered from a diagnosed sleep impairment, that impairment did

not rise to the level of a disability for purposes of the ADA because Reberg was not substantially limited in any recognized major life activity. Moreover, even if she were disabled, Road Equipment did all it could reasonably be expected to do to accommodate any such disability. Finally, the working conditions at Road Equipment were not egregious giving rise to a claim for constructive discharge. Therefore, Defendant Road Equipment's Motion for Summary Judgment is **GRANTED**. The clerk shall treat this action as terminated.

     **SO ORDERED.**

ENTERED: December 7, 2005

                                S/ Philip P. Simon
                                PHILIP P. SIMON, JUDGE
                                UNITED STATES DISTRICT COURT